Case No. 25, 1173, TCP Specialists, LLC Petitioner v. Secretary of Labor. Mr. Harrington for the Petitioner. Mr. Quick for the Respondent. Mr. Harrington, good morning. Good morning. May it please the Court. My name is Dick Harrington and I represent TCP Specialists, the Petitioner in this case. The case before the Court this morning is really important to the law governing OSHA. Specifically, this case will impact how OSHA enforces its General Duty Clause going forward. The General Duty Clause, as the Court may know, is OSHA's default provision under the Act where it does not have a specific standard. OSHA is required under the Act to promulgate through formal rulemaking procedures specific standards to address specific hazards in the workplace. But Congress recognizing that OSHA may not be able to promulgate all the specific standards it needed as soon as the Act was implemented, provided a General Duty Clause that's a default, and it simply requires employers to render a workplace free of recognized hazards. That was over 50 years ago. And the General Duty Clause has become since then a staple of OSHA's enforcement activity. One of the review commissioners back in 2019 in the case called A.H. Sturgill observed that, at least set forth a concern and a footnote that OSHA was using the General Duty Clause as kind of a gotcha standard. It would look back with 20-20 hindsight on a particular incident and find a way to cite the employer, and that maybe this was becoming a disincentive for OSHA to promulgate specific standards under the Act. But the General Duty Clause is tied to hazards, correct? It is tied, Your Honor. The way it reads is the employer has a duty to render the workplace free of recognized hazards. And this court, back in 1973, issued a decision, National Realty and Construction, which has been kind of a guiding light for the General Duty Clause for the last 50 years. And the court in that case recognized that the General Duty Clause is not a strict liability standard, that each of those terms has meaning. And so for an employer to be required to render a workplace free of recognized hazards is not strict liability. It means that the employer must have the ability to control that hazard. In this case, why wouldn't you say the employer had the ability to control, when we're talking about how close an employee would be to a particular hazard? Well, that's the linchpin to the whole case. How is the hazard defined?  And if it's defined too broadly, well, then that's not going to be a preventable hazard for the employer being cited. We have argued, as I'm sure Your Honor knows in our briefing quite extensively, that the hazardous condition must be something, some instrument that caused the injury itself. It must be something that the employer can prevent. Well, if the employer is directing the employee to be at a specific place on the work site, why isn't that preventable? Because it's at the direction of the employer. Well, because being at that specific place on the work site is inherent to the work. And the commission has held in Pelron that you cannot cite an employer for a risk that's just inherent in the job. These employees work on well sites. But there was certain knowledge that the employer had with respect to this piping before the employees were directed to go to that specific area of the work site. Well, Your Honor, I'm not sure which knowledge you're referencing, but TCP did not own the pump piping. They did not know it was corroded. They did not know it had not properly been inspected or pressure tested. They didn't have any knowledge of that. And all of that knowledge is key to determining whether or not there should be a buffer zone. They work around pressurized equipment every day. OSHA's experts said that it was perfectly appropriate for TCP employees to work near the lubricator, which is a highly pressurized piece of equipment, because TCP itself had pressure tested that piece of equipment. It actually operates and controls that piece of equipment. Now, TCP reasonably relied on Jaguar, the operator at the well site, who operated the piece of piping that's at issue, to inspect and pressure test that piping before pressurizing it. That's reasonable under OSHA jurisprudence. You can rely on a specialty contractor to do their job, and Jaguar should have inspected and pressure tested that piping. And so OSHA recognizes that employees can work near pressurized equipment. In fact, OSHA has specific standards, Your Honor, that allow employees to work on pressurized equipment. What were the TCP employees doing during the explosion? So they had their two employees near the wellhead, and they each had their own job. One was monitoring the pressure on the gauge at the wellhead to make sure that it didn't get too high. There's a hazard that if that pressure gets too high, it's going to eject their tools out of the wellbore, and that creates a huge safety hazard, as the Court might imagine. You've got a wire line with a very heavy tool on the end of it. If that gets ejected out, then now you've got a destruct by hazard. That was one employee. He's watching that pressure gauge to make sure it doesn't get too high. He has to be there. The other employee is actually watching Jaguar turn the valves. That's important because if those valves aren't turned properly, then the master valve on the wellhead might close and sever that wire line. That almost happened on the run before. They had already done this task once that day safely. But TCP recognized that Jaguar's operator almost cut the wire line with the main valve on the wellhead. So he went over to watch to make sure that that didn't happen again. If that wire line gets severed, then it's under tremendous tension, and then that's going to come loose and create a destruct by hazard. So the wire line has tools. What are the tools? Yeah, so there's, if you can imagine, Your Honor, there's multiple tools. So a wire line service provider like TCP will run tools down. Rills or wrenches? No, not those type of tools. One's a packer, and that kind of creates a seal inside the well bore, and it has different tubing that allows the product to go different directions. There's a plug that they could put down at the bottom. All of those are remote controlled, obviously? I mean, no human goes there, right? Yeah, it's my understanding. And where's the control center? It's in a truck that's, I don't know, I think 30, 40 feet away. If they can control that, why couldn't they do the same by sitting in the truck and watching the depressurization? Well, the pressure gauge itself is right at the wellhead. They don't have remote access. Yeah, for whatever reason, the industry, you look at that gauge at the wellhead, there's not any remote access to it from a different location. But didn't Jason Walker testify that he knew depressurization of the well posed a risk of an explosion? It's a general recognition. That's not adequate to establish a recognized hazard. You mean on that particular site then? Yes, or any site. Anytime equipment's being pressurized, there's a hazard. And TCP would stipulate to that. I think any employer who works as a processing plant, a refinery, a chemical plant, would recognize that pressurized equipment presents a hazard. But that's not enough under the General Duty Clause to establish a violation. Is there any wrongful death actions against your company as a result of this explosion? No. Is it workman's comp covered? Yes.  Our TCP only did not have a fatality, had an injury. The Jaguar employee was killed, and then the site supervisor, the gentleman that was in charge of the entire operation, was killed. Along that line, did any other company receive a citation? It's my understanding that the other companies also received a citation. I think it was apparently OSHA's practice to cite everybody and then ask questions later. And that's not how the General Duty Clause is supposed to be applied. You can't cite every employer because there was an accident. The secretary has argued in her brief that it's a violation simply because TCP allowed its employees to work near pressurized equipment that might possibly rupture for whatever reason. And for whatever reason, it's the secretary's language. That's not the law. It can't be for whatever reason. It has to be for a reason that's preventable by TCP, a reason that is under the control. Taking back to preventable, do you believe that your employees were positioned correctly at the time of the accident? Yes, Your Honor. And why is that? Because they had safety-related tasks to perform their work, and they could and should have been able to reasonably rely on Jaguar to pressure test all of its equipment before they used it, or certainly before they pressurized it. And that's why the definition of the hazard is so important to getting the General Duty Clause right. When you say should have been able to rely on Jaguar regarding the pressurization, were there conversations by your employees to Jaguar to be insured of that? There's no – Because you make it sound like there's an assumption that you should be able to walk to the work site and expect that anybody else who was there had tested out everything. Well, the reliance, Your Honor, the reasonable reliance is that any employer who's going to be responsible for and control a piece of equipment pressure tests that equipment. That's what both experts testified to. And both experts testified that TCP was reasonable in relying on Jaguar to pressure test that piece of piping before it pressurized it. There was confusion on Jaguar's part. They borrowed this piping early that morning. TCP is not a party to any of these conversations. But they borrowed it on the representation that they were not going to pressurize it. They borrowed it from a company called Reliance. And the first time the well was bled down, they did not pressurize that piece of corroded pipe and therefore did not present a hazard. Unfortunately, when they decided to depressurize the well the second time, the site supervisor, one of the gentlemen who was killed, made the decision that he wanted the valve at the far end of this piping to be closed. TCP is not a part of any of these conversations or decisions has no knowledge of it. Vailjay actually made that finding. And unfortunately, when the valve at the far end of the pump piping was closed, that resulted in the piping being pressurized. And then once the piping is pressurized, it can't, if it's corroded and hasn't been pressure tested, then it becomes a hazardous condition. But what's an example of a fact you believe would have corrected or cured the citation's deficiency? If the hazard was properly defined by the judge as the corroded piping, the actual instrument that created the struck-by hazard, employees are allowed to work around pressurized equipment. Under OSHA's specific standards, properly promulgated formal standards, OSHA allows employees to work around pressurized equipment, to work on pressurized equipment. Its lockout standard actually allows employees to weld on pressurized gas lines. They can perform hot work on pressurized gas lines. Working near pressurized equipment, the definition used by Vailjay, is not a recognized hazard in any industry, none that's been identified. And certainly in this case, TCP worked around this lubricator tool that hangs right over the wellhead. It's highly pressurized. And OSHA's experts said you don't need a buffer zone there because they pressure tested it. And so this buffer zone is really just an arbitrary number that the expert came up with. He said it's supposed to be based on technical calculations, but he didn't do those technical calculations. In his words, the 100-foot buffer zone was arbitrary. And he didn't expect TCP's employees to do those calculations. He didn't do them. And so we have this arbitrary 100-foot buffer zone. There's no authority for it. And yet that leads the judge to deciding that, well, these employees are working too close to pressurized equipment because they're inside this 100-foot buffer zone. That leads Vailjay to erroneously decide that TCP had knowledge of the hazard because its employees are inside this 100-foot buffer zone that's arbitrary. And then, of course, it leads Vailjay to erroneously decide that, well, the method of abatement, a 100-foot buffer zone, is feasible. And yet it's not supported by the evidence. A buffer zone, if it's needed, is determined based on a risk assessment. That's in the API document that OSHA cites for authority. You have to do a risk assessment. Nobody expects a contractor like TCP to be part of that risk assessment. They're not qualified. They don't have the expertise or the experience. And so they're not going to know whether line restraints or a buffer zone are required. And Vailjay actually agreed with that in part. He said, well, they can't know if line restraints are necessary, so that's not a feasible means of abatement because they don't have the necessary knowledge to do this risk assessment. Well, it's the same risk assessment for the buffer zone. I don't know why he didn't reach the same conclusion for the buffer zones he did for the line restraints. Thank you. Mr. Quick. Good morning. You may please the court. I'm Joseph Quick for the Secretary of Labor. The judges, all parties to this matter, knew that depressurizing a gas well, also known as bleeding off, carries the risk of fire, explosion, and struck by hazards. TCP's workers should not have been near the gas well while it was being bled off if they didn't need to be near the well. And keeping employees away from the well is well within TCP's control. This was a preventable hazard. Now, TCP, of course, they're not arguing that there was no hazard on the site. They're just arguing that the Secretary, as affirmed by the ALJ, did not cite a preventable hazard. I will explain, in turn, why the company is wrong and why there is substantial evidence in the record to affirm the ALJ's decision. So if we look to what the general duty clause requires, first it requires the Secretary to show that a condition or activity in the workplace presented a hazard. Now, the commission has stated the ALJ is required to define the hazard in a way that apprises the employee of its obligations and identifies conditions and practices over which the employee can reasonably be expected to control. Depressurizing the gas well is the activity that presented the fire, explosion, and struck by hazard. It's not how counsel characterizes just generally working near pressurized equipment. It's specific to depressurizing the gas well, also known as bleeding off. And the condition or practice that is well within TCP's control was the approximate location of the employees. Now, TCP didn't own or control the worksite, though, so how would you respond to that part about them not suggesting that they had any agency in this matter? Well, simply they are an exposed employee, and as an exposed employee, they have a duty to keep the place free of a recognized hazard from their own employees. So in that regard, they are still responsible to their employees, so they have a duty still. Now, the way the ALJ defined the hazard is lockstep with how the Secretary sparse out the hazard in our citation. So all of the challenges TCP makes to the language, they're without merit. But they suggest that they were merely standing near a pressurized pipe, and then also that there's no liability, essentially, from just standing near a pressurized pipe. So what do you contend that they were doing on the site to be near the pipe? Well, at that time, they weren't doing anything. They were nonessential. That is also a linchpin in this case. They were not needed there. And as such, this is why it's reasonable, at the very least, to set forth a buffer zone. That's just one of many feasible abatement methods that could have been put in place in this case. Of course, they aren't required to have done a buffer zone, but whatever, like, methods that they could employ and should employ to keep their employees safe, that's what they should have done in this case. If we were to find that a buffer zone was needed, right now the record shows that the other employees, I believe it was the Reliance employees, were 100 feet out. But I'm not sure that we would have the ability to make a determination about what the specific, you know, linear feet should be. Yeah, so as it relates to that, the Secretary Esper did credibly testify. Not that 100 feet is an arbitrary number that he made up. It's something that they use in the industry whenever they're working in the field and they aren't able to make, you know, scientific calculations as far as how far the buffer zone needs to be. This is just a number that folks in the industry recognizes will, at the very least, keep folks safe or materially reduce the harm or the risk. I guess what I'm asking is would it be sufficient just to say a buffer zone was needed as an adequate remedy and let the facts of that case draw on how far the facts of the specific situation determine how far, as opposed to us saying it must be 100 feet? Yes, Judge, I do believe it is the court. It is sufficient for the court to say as it relates to TCP's duties to its employees, a 100-foot buffer zone would have been a feasible means of abatement. As it relates to depressurizing the well, specifically to this case. Okay, so the 100 feet is specific to the case and that buffer zone should be 100 feet. Correct, Judge. It's a specific finding based on the Esper's testimony as it relates to this case. So back to the specificity of the definition in this case is specific, as I stated before, because we're not talking about just working around any pressurized equipment. It's working near the frac stat during depressurization. And I do not believe TCP is, like, challenging whether this hazard is a recognized hazard because their own employees and even their own expert testify that it is known that bleeding off a well carries the risk of fire explosion and struck by hazards. So far as it relates to feasible means of abatement, Judge Charles, I do believe you touched on exactly what the Secretary is getting at. The 100-foot buffer zone, as it relates to this case, is a feasible means of abatement, and that is the Secretary's burden is to put forth a feasible means of abatement so that the employer knows what's to be expected of them. And, of course, TCP had knowledge of the hazardous conditions. Their supervisor, Walker, he knew that their two employees were standing near the well as it was being bled off. He also knew that bleeding off a well carries the risk of fire explosion and struck by hazards. And why were the Reliance employees standing outside of the buffer zone? I would posit for that very reason because they knew being near a well, being near a well during depressurization carries this risk of explosion or struck by hazards. Or in a pipe rush, we're talking about a pipe that has thousands of pounds of pressures coming through it, and this is a temporary pipe. This is not a permanent pipe that has restraints and other structural members to keep it in place. And even in this particular place, the temporary pipe had no line restraints. So that's all the more reason that, you know, the employer's antennas should have been going off, that we need to do something to keep our employees safe. How important is it that this did not occur during normal operations? I'm sorry, Jez. How important is it that this accident occurred outside of normal operations? I mean, I think at least twice someone testified that under normal operations, and this was not the depressurization action was not a normal operation. So I don't necessarily see the importance as it relates to defining hazard or as it relates to the work being done on the site. Just because whether it's normal operations or not, it's known that if you're bleeding off a well, it carries these sorts of risks. So to the extent that you're stating, like, as it relates to the feasible means of abatement, perhaps it may go to that element to us. But as far as it, whether it occurred during normal operations or outside of normal operations, this was still work being done. And as such, the employer is responsible for keeping his employees safe. I also wanted to ask you if it's in the record what these other three companies, Reliance, Jaguar, and Brammer, what type of sanction they were given. Do you know? Yeah, so I don't know all the specifics, Jez, but I do know that these other employers were charged. It's my understanding that most settled their citations, but I do not know the specifics of those settlement agreements. Is $6,000 a normal sanction for something like this that killed two people and injured others? So as it relates to TCP specifically, like, you know, they only had the two employees. I do believe only one of their employees was injured, although they did have employees exposed. So insofar as, you know, we're holding them accountable for their employees and what they could control at the site, I don't have the experience to know whether it's normal, so to speak, but I do think it's within the realm of what we tend to do in these sorts of situations. So, judges, the panel doesn't have any other questions to close. I just want to state by saying if you look at the SeaWorld citation and how we cite it, in that case, it is lockstep with the way the citation is cited in this matter. So TCP's contention that somehow this is the secretary is going rogue and implementing, you know, different standards for them as just a small employer at this work site, those arguments are without merit. TCP was cited for what it could control and for its preventable hazards. As such, I do think there's substantial evidence in the record to affirm the ALJ's decision, and the secretary asks this court to affirm that decision. Thank you. Your Honor, to answer your question regarding Reliance, their work had not begun yet, and that's why they were standing off to the side. They weren't engaged in any work at the time. The pump piping that's at issue was borrowed from Reliance. In fact, Jaguar borrowed the pump piping from Reliance on the representation that it was not going to be pressurized. TCP was not a party to any of these conversations or decisions. Had Jaguar pressure tested that pump piping like it was supposed to per the industry standard, as agreed to by OSHA's expert, then this hazard would have been abated. There'd be no need for a buffer zone at any distance, just as there was no need for a buffer zone around the lubricator or any of the other pressurized equipment on site. There's hundreds of pieces of equipment. All the fact witnesses in this case, including and in addition to that, TCP's expert, testified they had never heard of a 100-foot buffer zone around pump piping. That was something new and novel. Being within 100 feet of a pump piping during depressurization activity is not a recognized hazard. This 100-foot buffer zone, Your Honor, I would suggest is the thread that if you pull it, the Secretary's entire case comes unraveled. But, again, the question I asked of the other side too was, is it the buffer zone or is it the 100-foot buffer zone that matters? Well, there's no evidence in the record to support any other buffer zone either. The expert testified this was an arbitrary number that he came up with. He first testified that buffer zones and the distance should be based on technical calculations, and he testified, but he doesn't expect TCP employees to be able to make those calculations in the field, so he uses an arbitrary distance on his work. None of the other employees had ever heard of a 100-foot buffer zone around pump piping. It's just, to them, it was completely alien. And as far as the Reliance employees being outside of the 100-foot buffer zone, maybe they were, maybe they weren't, but they weren't engaged in the work. That's why they were off to the side. And just so that the record's clear, Your Honor, when the pipe ruptured, the fragments from the pipe went much further than 100 feet. So I think one could argue, well, the further you get away from some sort of ruptured piping, the safer you are, to be sure. But where the 100-foot distance comes from is completely arbitrary, and there's really no evidence to support either the need for 100 feet, nor is there any evidence to know that TCP had knowledge that a buffer zone was required under these circumstances around that pump piping. It didn't need it around the lubricator at the wellhead because that had been properly pressure tested. All right. Thank you.
judges: Henderson; Childs; Randolph